SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Patricia Delvecchio v. Township of Bridgewater (A-25-14) (074936)**

**Argued October 27, 2015 – Decided April 28, 2016**

**Patterson, J., writing for a unanimous Court.**

In this appeal, the Court considers whether a plaintiff may rely on the testimony of a treating physician, who has not been designated as an expert witness, to establish the existence of a disability for a claim under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 et seq.

On February 18, 1999, plaintiff Patricia A. Delvecchio commenced employment with the Township of Bridgewater (Township) as a dispatcher for the Police Department (Department). At that time, the Township maintained three shifts for police dispatchers, including a midnight shift, and required dispatchers to work each of the shifts on a rotating basis. In 2003, plaintiff developed inflammatory bowel syndrome (IBS), and began treatment with Dr. Gary Ciambotti (Ciambotti), a gastroenterologist. Ciambotti wrote to plaintiff's supervisors and stated that her symptoms were under control as long as she worked regular daytime hours, but would be exacerbated by an assignment to the midnight shift.

In response to plaintiff's requests, the Township initially provided her with a steady afternoon shift, but subsequently stated that it was no longer possible to assign her consistently to the daytime shift due to the burden that this imposed on other employees who covered the remaining shifts. Plaintiff asked the Township to reconsider, and the Township then permitted her to continue working daytime shifts, but with no guarantee that she could entirely avoid midnight shifts. The Township subsequently required her to be available for an occasional midnight shift, as necessary.

In September 2006, plaintiff also began treating with Dr. Joseph Rochford (Rochford), a psychiatrist, who diagnosed her as having anxiety and panic attacks. After a staffing change increased plaintiff's concern that she would again be required to work midnight shifts, she provided the Township with notes from Rochford, who stated that such assignments would exacerbate plaintiff's stress condition, and Ciambotti, who reiterated his opinion that she should not be compelled to work midnight shifts. In March 2007, Ciambotti stated that it was absolutely medically necessary that the Township refrain from assigning plaintiff to midnight shifts.

On December 24, 2007, plaintiff declined her supervisor's request that she work a midnight shift, and another dispatcher was required to remain on duty to cover the shift. This precipitated complaints by other dispatchers, and the Township concluded that plaintiff's unwillingness to work a midnight shift imposed an undue burden on it. The Township asked plaintiff to resign. She refused, and accepted another position with the Township as a records clerk, but at a lower salary. On September 16, 2009, the Township terminated plaintiff's employment for neglect of duty and chronic/excessive absenteeism.

Plaintiff filed a complaint for disability discrimination and retaliation under the LAD challenging her termination from employment. In response to defendants' discovery requests, plaintiff stated that she had not retained any expert witnesses, but identified Ciambotti and Rochford as treating physicians who were expected to testify. Plaintiff summarized Ciambotti's proposed testimony, but did not serve expert reports from Ciambotti or Rochford. The trial court sustained defendant's objection to the testimony, and did not permit Ciambotti to opine on his diagnosis and treatment for plaintiff since he had not prepared an expert report. The court also limited Rochford's testimony by precluding any opinion regarding plaintiff's diagnosis.

At the conclusion of the trial, the jury returned a verdict of no cause of action. The trial court denied plaintiff's motions for judgment notwithstanding the verdict and for a new trial. Plaintiff appealed. In an unpublished decision, the Appellate Division reversed and remanded for a new trial on the ground that the trial court

1

had improperly restricted the testimony of Ciambotti. This Court granted defendant's petition for certification. 220 N.J. 98 (2014).

**HELD:** The testimony of a treating physician is admissible to support a plaintiff's disability claim under the LAD, provided that the proponent gives notice of the testimony to the adverse party, responds to discovery requests in accordance with the Rules of Court, and the testimony satisfies N.J.R.E. 701 and other applicable Rules of Evidence. Plaintiff provided the information that defendants requested in discovery regarding the proposed treating physician witnesses, and the trial court should have permitted her to present the vital testimony of these witnesses.

1. The applicable standard of review requires that an appellate court not reverse a trial court's determination of a motion for a new trial unless it clearly appears that there was a miscarriage of justice under the law. R. 2:10-1. A reviewing court should not disturb the findings of the jury merely because it would have found otherwise upon review of the same evidence; a jury verdict, which is challenged as against the weight of the evidence, is impregnable unless so distorted and wrong that it plainly constitutes a miscarriage of justice. (pp. 16-17)

2. Plaintiff's claims are premised on N.J.S.A. 10:5-4.1, which prohibits unlawful discrimination based on a disability unless the nature and extent of the disability reasonably precludes the performance of the particular employment. Plaintiff offered the treating physician testimony that the trial court excluded in an effort to address a pivotal element of the claim by establishing that she had a disease or condition that constitutes a disability under the LAD. The LAD broadly defines a protected disability, and covers both physical and non-physical disabilities. A claim under the LAD based on a non-physical disability, where the existence of a handicap is not readily apparent, must be supported by expert medical evidence in the form of objective medical testimony that will allow the jury to understand the disease or condition alleged to constitute a disability. (pp. 17-23)

3. Treating physicians have been consistently permitted to offer medical testimony regarding the diagnosis and treatment of their patients. When treating physicians are called to offer such testimony, they are not testifying as expert witnesses, but, instead, are offering factual evidence and opinion evidence governed by N.J.R.E. 701. The Rule allows a court to admit testimony of a lay witness in the form of opinions or inferences provided that the testimony is rationally based on the perception of the witness, and will assist in understanding the witness's testimony or in determining a fact in issue. The testimony of a treating physician must be limited to issues that are relevant to the diagnosis and treatment of the individual patient. If a particular claim requires medical testimony beyond the scope of such individual patient care, expert testimony may be required. (pp. 23-25; p. 27)

4. Our court rules provide for pretrial disclosure to the opposing party in discovery of information relating to treating physicians, including by interrogatories, deposition, and provision of the treating physician's report, in order to allow the adverse party to explore and assess the physician's testimony prior to trial. A party seeking to present the testimony of a treating physician at trial must therefore disclose to the adverse party the substance of the witness's anticipated testimony and the basis for the testimony, if requested to do so in discovery. (pp. 25-27)

5. Prior decisions of this Court do not preclude the admission of treating physician testimony to support a LAD claim based on the existence of a disability. The question of disability is a medical determination, and the testimony of a qualified witness will assist the jury in making that determination. If the question of a plaintiff's disability can effectively be addressed by testimony limited to the plaintiff's diagnosis and treatment, a treating physician may provide the necessary expert medical evidence through objective medical testimony. (pp. 27-28)

6. Under these principles, the trial court should have permitted the proposed testimony of plaintiff's treating physician, limited to his diagnosis and treatment of plaintiff. The court's constraint on the testimony of the treating physician was not harmless error because plaintiff was not afforded a fair opportunity to prove that she suffered from a disability under the LAD. The trial court also erred when it restricted the testimony of plaintiff's treating psychiatrist since the opinions that plaintiff sought to elicit from him were properly confined to her symptoms, diagnosis and care. Due to the limitations that the trial court imposed on the testimony of the treating physician, there is a miscarriage of justice warranting the grant of a new trial. (pp. 28-31)

The judgment of the Appellate Division is **AFFIRMED,** and the matter is remanded to the trial court for a new trial**.**

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

PATRICIA DELVECCHIO,

    Plaintiff-Respondent,

       v.

TOWNSHIP OF BRIDGEWATER, TOWNSHIP OF
BRIDGEWATER POLICE DEPARTMENT, CHIEF
RICHARD BORDEN, and WILLIAM CONNIFF,

    Defendants-Appellants,

       and

EDWIN J. SKIDMORE and CATHY HAMILTON,

    Defendants.

        Argued October 27, 2015 – Decided April 28, 2016

        On certification to the Superior Court,
        Appellate Division.

        Alan Bart Grant argued the cause for
        appellants (Mauro, Savo, Camerino, Grant &
        Schalk, attorneys).

        Brian M. Cige argued the cause for
        respondent.

        Thaddeus P. Mikulski, Jr., argued the cause
        for amicus curiae National Employment
        Lawyers Association of New Jersey, Inc.

    JUSTICE PATTERSON delivered the opinion of the Court.

    In this appeal, we consider whether a plaintiff employee
may rely on the testimony of a treating physician, who has not
been designated as an expert witness, to demonstrate a

disability in her discrimination claim under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42.

Plaintiff Patricia A. Delvecchio was employed by the Township of Bridgewater (Township) as a police dispatcher for the Township's Police Department (Department). She alleged that she suffered from inflammatory bowel syndrome (IBS), and that her condition worsened when she was assigned to work the midnight shift. After repeatedly declining assignments to the midnight shift, plaintiff was asked to resign from her position. She then accepted a lower-paying job as a records clerk for the Township. Plaintiff used more than her allotted sick days, and the Township terminated her employment.

Plaintiff filed a LAD disability discrimination complaint against the Township, the Department, and individual defendants. She contended, among other claims, that her IBS constituted a disability for purposes of LAD, and that defendants failed to provide a reasonable accommodation for that disability when they set the schedule for her work as a police dispatcher. Plaintiff disclosed in pretrial discovery that, in support of her disability claim, she intended to present the testimony of her treating gastroenterologist, who had diagnosed her with IBS and had written several notes to the Township regarding her medical condition and her work schedule. She also advised defendants

2

that she intended to present the testimony of her treating psychiatrist to substantiate her claim for non-economic damages.

The trial court barred the testimony of both treating physicians regarding plaintiff's diagnosis and treatment on the grounds that neither physician had been retained and designated as an expert witness and that neither witness had prepared a report. The jury determined that plaintiff had failed to establish that she had a disability that prevented her from working midnight shifts, and that she had not met her burden to prove retaliation. After the jury returned a verdict in favor of defendants, the trial court denied plaintiff's motion for a new trial. Plaintiff appealed, and an Appellate Division panel reversed the trial court's judgment. It held that the trial court committed error when it limited the testimony of plaintiff's treating gastroenterologist and remanded the case for a new trial.

We affirm the judgment of the Appellate Division. Subject to the notice and discovery requirements of our court rules and the requirements of N.J.R.E 701 and other Rules of Evidence, our case law authorizes a trial court to admit the testimony of a treating physician regarding the diagnosis and treatment of a patient. Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 314 (1995); Ginsberg v. St. Michael's Hosp., 292 N.J. Super. 21, 32-33 (App. Div. 1996); N.J.R.E. 701; R. 4:10-2(d); R. 4:17-4. In

3

this case, plaintiff provided the information requested in defendants' interrogatories regarding her proposed treating physician witnesses, and the trial court should have permitted her to present the vital testimony of those witnesses pursuant to N.J.R.E. 701.  In light of the pivotal role of the IBS issue in the jury's verdict, the trial court's decision to limit the testimony of the treating gastroenterologist constituted reversible error.  Accordingly, plaintiff is entitled to a new trial.

I.

On February 18, 1999, plaintiff commenced her employment as a police dispatcher for the Township.  At the time, the Township maintained three shifts for police dispatchers:  a morning shift, an afternoon shift and a midnight shift.  The Township's job description for dispatchers required employees to work all three shifts on a rotating basis, with assignments determined in part by seniority.

In 2003, plaintiff developed a digestive condition that would later be diagnosed as IBS.[1]  Shortly thereafter, she became

---

[1]  IBS is one of the "most common functional gastrointestinal disorders worldwide. . . . with anywhere from 5 to 15% of the general population experiencing symptoms that would satisfy a definition of IBS[.]"  Alexander C. Ford et al., American College of Gastroenterology Monograph on the Management of Irritable Bowel Syndrome and Chronic Idiopathic Constipation, 109 Am. Journal of Gastroenterology S2 (Supp. 1 Aug. 2014).  It is diagnosed when the patient experiences "[r]ecurrent abdominal

a patient of Gary Ciambotti, M.D., a gastroenterologist.  At plaintiff's request, Dr. Ciambotti wrote a series of notes to her supervisors at the Township.  In several of his notes, Dr. Ciambotti stated that plaintiff's IBS symptoms were under control as long as she worked regular daytime hours, but would be exacerbated by an assignment to the midnight shift.

In response to plaintiff's requests and Dr. Ciambotti's correspondence, the Township initially provided plaintiff with a steady afternoon shift for six months, and extended that arrangement for an additional year.  In October 2005, a supervisor advised plaintiff that it was no longer possible for the Township to consistently assign her to a daytime shift, due to the burden imposed on other employees who covered the remaining shifts.  Plaintiff asked the Township to reconsider, and with the cooperation of plaintiff's colleagues, she was permitted to continue working daytime shifts, but with no guarantee that she would be permitted to entirely avoid midnight shift assignments.  At plaintiff's request, Dr. Ciambotti advised the Township in November 2005 that plaintiff could work an occasional midnight shift.

---

pain or discomfort," in conjunction with two or more associated digestive symptoms, at least three days per month over a three-month period.  Ibid.

5

Weeks later, however, plaintiff sought to be excused from work entirely until the Township limited her schedule to daytime shifts. In response to another letter from Dr. Ciambotti, the Township granted a further accommodation, assigning plaintiff to afternoon shifts to the extent that such shifts were available. The Township required that plaintiff be available to work an occasional midnight shift, and denied her request for extended sick leave.[2]

In September 2006, Dr. Joseph Rochford, a psychiatrist, began treating plaintiff. He diagnosed plaintiff with anxiety and panic attacks and prescribed medication. After a staffing change caused plaintiff to worry that she would again be asked to work midnight shifts, she obtained a note from Dr. Rochford, who stated that midnight shift assignments would exacerbate plaintiff's "stress" condition, and a note from Dr. Ciambotti, who again opined that plaintiff should not be compelled to work midnight shifts. In March 2007, Dr. Ciambotti stated that it

---

[2] The Township arranged for plaintiff to be examined by a gastroenterologist, who confirmed the diagnosis of IBS, but maintained that, with proper medication, plaintiff was capable of working "in her normal fashion." The Township also required that plaintiff be evaluated by a psychologist, who found no evidence of "significant clinical pathology" but confirmed that plaintiff was under stress when she anticipated the necessity of working a midnight shift.

6

was "absolutely medically necessary" that the Township refrain from assigning plaintiff to midnight shifts.

The dispute between plaintiff and the Township escalated on December 24, 2007, when plaintiff declined her supervisor's request that she work a midnight shift, complained of heart palpitations, and was taken to a hospital. Another dispatcher, who had already worked a shift and a half, was compelled to remain on duty for the shift assigned to plaintiff. This development precipitated complaints by other dispatchers. At that point, the Township concluded that plaintiff's unwillingness to work a midnight shift had imposed an undue hardship on it. After a renewed request by Dr. Ciambotti that plaintiff not be assigned any midnight shifts, even in emergencies, the Township asked her to resign. Plaintiff refused, and asked whether the Township could offer her another job opportunity. Plaintiff was then offered, and accepted, a position as a records clerk at a salary lower than the salary that she was paid as a police dispatcher.

On September 16, 2009, plaintiff's employment as a records clerk for the Township was terminated. The Township cited plaintiff's record of taking sick days in excess of the number allotted to her in 2007, 2008 and 2009. It attributed her termination to "neglect of duty" and "chronic/excessive absenteeism."

7

II.

Plaintiff filed a LAD complaint against the Township, the Department and four individual defendants.[3]  In an amended complaint, plaintiff claimed that she was subjected to a hostile work environment as a result of her alleged disability, that defendants failed to provide a reasonable accommodation for her disability, that she was wrongfully demoted or transferred from her position as a police dispatcher as a result of her disability, that her employment as a records clerk was wrongfully terminated, and that she was subject to retaliation. Defendants denied plaintiff's allegations of discrimination, and asserted that they offered reasonable scheduling accommodations.

In her answers to interrogatories served by defendants during pretrial discovery, plaintiff identified Dr. Ciambotti and Dr. Rochford as individuals with "knowledge, information or evidence of the incident(s)" alleged in the complaint, and listed both witnesses in response to another interrogatory requesting the names of plaintiff's treating physicians.  In response to an interrogatory seeking identification of "any expert witnesses you may use at trial" and "the substance of the opinions to be provided" by those expert witnesses, plaintiff

---

[3]  Prior to trial, the trial court granted summary judgment dismissing plaintiff's claims against two of the individual defendants.

8

stated that she had not "retained witnesses at this time," but identified several "treating professionals [who] have expertise and are expected to testify[.]" Plaintiff summarized Dr. Ciambotti's proposed testimony as follows:

> [Dr. Ciambotti] will testify regarding Plaintiff's diagnosis of Irritable Bowel Syndrome, namely that it is a disability, how it [a]ffects her everyday life as well as what steps need to be taken to prevent and alleviate symptoms such as a regular sleep schedule, medication regimen, and which factors, such as stress and constant schedule changes, aggravate her condition.

Plaintiff also informed defendants that Dr. Rochford would testify about her "non-economic damages, particularly how the stress, retaliation and discrimination by Defendants caused plaintiff stress, anxiety." Based upon the appellate record, it does not appear that defendants requested that plaintiff serve written reports by her treating physicians, that plaintiff served such reports, or that defendants deposed the physicians. On the parties' joint witness list, Dr. Ciambotti and Dr. Rochford were not listed among plaintiff's experts, but were designated as "plaintiff's treating doctors" expected to testify on her behalf.

The case was tried before a jury over thirteen trial days. The issue now before the Court arose during a discussion between the trial court and counsel regarding the notes written to the Township by Dr. Ciambotti, Dr. Rochford, and two other

9

physicians who were not on plaintiff's witness list. The trial court decided to admit into evidence Dr. Ciambotti's notes regarding plaintiff's IBS, with a limiting instruction, directing the jury to consider them only as a request for a reasonable accommodation, and not as evidence that plaintiff suffered from any disease or illness. The trial court commented that New Jersey law bars a treating physician from opining about a plaintiff's diagnosis and the impact of a plaintiff's schedule on her condition, if that physician is not designated as an expert witness. The court rejected plaintiff's counsel's contention that a treating physician is permitted to testify about the patient's symptoms, factors that worsen those symptoms, and the patient's care. Following that discussion, the trial court issued the limiting instruction.

There remained, however, a dispute between the parties regarding the scope of Dr. Ciambotti's testimony. During the treating physician's direct examination, defendants objected to plaintiff's counsel's request that Dr. Ciambotti define IBS for the jury, and argued that the treating physician was barred from any testimony about plaintiff's diagnosis because he was not a designated expert witness.

The trial court sustained defendants' objection, stating that Dr. Ciambotti should not opine on "diagnosis and treatment" in light of the fact that he had not prepared an expert report.

The trial court permitted Dr. Ciambotti to identify the conditions for which he treated plaintiff, and discuss his notes to the Township, but barred any testimony by the treating physician about the impact of plaintiff's work schedule on her IBS. Plaintiff's counsel confined his direct examination of Dr. Ciambotti to two subjects: the physician's series of notes to the Township and his statement that he was currently treating plaintiff for two digestive conditions, IBS and gastroesophageal reflux disease, with no explanation about either condition.

Pursuant to Rule 1:8-8(d), members of the jury submitted questions to be posed to Dr. Ciambotti. The trial court permitted the physician to respond to two jury questions, one addressing patients' requests that physicians write notes to employers, and the other inquiring whether plaintiff had an ulcer. The court, however, declined the jury's request that Dr. Ciambotti be asked about the impact of changing work schedules on the efficacy of IBS medications, the importance of an IBS patient's regular meal schedule, and the classification of IBS as a disability.

Plaintiff also presented the testimony of Dr. Rochford. On direct examination, the psychiatrist briefly described his treatment of plaintiff for stress and related complaints. The trial court admitted into evidence a letter from Dr. Rochford to the Township recommending that plaintiff not be assigned to

11

midnight shifts, with a limiting instruction, directing the jury to consider the letter only as a request for a reasonable accommodation.  The court reiterated to plaintiff's counsel that because Dr. Rochford was not designated as an expert witness, counsel would not be permitted to elicit from the psychiatrist any opinion regarding plaintiff's diagnosis.  Dr. Rochford briefly testified within the limits set by the trial court.

Plaintiff later called as a witness an expert psychologist, who opined that as a result of stress triggered by her work schedule, plaintiff suffered from an adjustment disorder with mixed anxiety and depression.

Defendants called two expert witnesses.  Their expert gastroenterologist opined that IBS is a functional disease not characterized by visible structural abnormalities, that IBS patients can work normally if they are permitted to eat at normal intervals, that he had never treated a patient with IBS who was disabled, and that plaintiff's digestive symptoms were within the normal range.  Defendants' expert psychologist concurred that patients with IBS may function effectively despite changing conditions in the workplace.

At the conclusion of the evidence, the trial judge repeated his limiting instruction, directing the jury to consider the physicians' notes only as proof that plaintiff had requested reasonable accommodations.  The court cautioned the jury that

only three experts -- plaintiff's expert psychologist and defendants' expert gastroenterologist and psychologist -- had testified, and that the jury should not consider "opinions expressed by other witnesses as evidence of the plaintiff's medical condition."  Plaintiff did not object to the jury charge.

The jury returned a verdict of no cause of action, determining that plaintiff had not proven by a preponderance of the evidence that she suffered from a disability that precluded her from working the midnight shift.  The jury also rejected plaintiff's claim that defendants retaliated against her for complaining about discrimination and for filing a lawsuit.

After her motion for judgment notwithstanding the verdict (JNOV) under Rule 4:40-2 was denied, plaintiff moved for a new trial pursuant to Rule 4:49-1(a).  She cited, among other grounds, the trial court's restriction on the testimony of her treating physicians.  Defendants countered that the treating physicians had rendered "net opinions" and that the trial court had properly limited their testimony.

Although the trial court conceded that treating physicians may be permitted to testify about the issue of causation, it characterized its ruling at trial as an invocation of Rule 4:17-4(e), based on the treating physicians' failure to supply expert reports.  The court stated that the limiting instruction given

13

to the jury with respect to the physicians' notes resolved any issue regarding their testimony.  It denied plaintiff's motion for a new trial.

Plaintiff appealed the trial court's judgment.  In an unpublished opinion, an Appellate Division panel reversed the trial court's judgment and remanded for a new trial on the ground that the trial court had improperly restricted the testimony of Dr. Ciambotti.  The panel reasoned that under Stigliano, supra, 140 N.J. at 314, and Ginsberg, supra, 292 N.J. Super. at 32-33, the trial court erred by barring Dr. Ciambotti from testifying about plaintiff's diagnosis and treatment and when it precluded Dr. Ciambotti from explaining the reasons for his notes to the Township.  The panel concluded that the trial court's restriction on the testimony of Dr. Ciambotti was not harmless error.  The panel did not specifically address a second issue raised by plaintiff on appeal -- whether the limitations imposed on the testimony of plaintiff's treating psychiatrist, Dr. Rochford, constituted error.

We granted defendant's petition for certification.  220 N.J. 98 (2014).  We also granted the motion of the National Employment Lawyers Association of New Jersey (NELA-NJ) to appear as amicus curiae.

III.

14

Defendants urge the Court to reverse the Appellate Division's determination and reinstate the trial court's judgment. They contend that under this Court's decisions in Clowes v. Terminix International, Inc., 109 N.J. 575 (1988), and Viscik v. Fowler Equipment Co., 173 N.J. 1 (2002), a LAD disability claim must be supported by the testimony of retained expert witnesses, not the speculative testimony of treating physicians called as witnesses at trial. Defendants characterize the panel's opinion as an unwarranted extension of this Court's decision in Stigliano, which would authorize a treating physician in a LAD disability case to provide opinion testimony unrelated to either objective standards or the physician's treatment of the plaintiff.

Plaintiff counters that the trial court's interpretation of N.J.R.E. 701 contravened Stigliano and Appellate Division decisions applying its principles. She contends that a treating physician need not be designated as an expert witness in order to offer a medical opinion on the cause of his or her patient's condition. Plaintiff argues that the constraints imposed by the trial court on the testimony of Dr. Ciambotti and Dr. Rochford made it impossible for her to demonstrate a disability for purposes of LAD.

Amicus curiae NELA-NJ contends that the trial court's restriction of the testimony of Dr. Ciambotti constituted error

15

because the limitations imposed by a medical condition on a patient's activities are an integral component of medical treatment. NELA-NJ argues that the trial court's error substantially prejudiced plaintiff's case, and that plaintiff is entitled to a new trial.

                              IV.

                              A.

We begin our analysis with the standard of review governing the trial court's denial of plaintiff's motion for a new trial, pursuant to Rule 4:49-1. An appellate court will not reverse a trial court's determination of a motion for a new trial "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1; see also State v. Sims, 65 N.J. 359, 373-74 (1974) ("[T]he trial court's ruling on [a motion to grant a new trial] shall not be reversed unless it clearly and convincingly appears that there was a manifest denial of justice under the law."). A reviewing court should not disturb the findings of the jury merely because it would have found otherwise upon review of the same evidence. Carrino v. Novotny, 78 N.J. 355, 360 (1979) ("[A] jury verdict, from the weight of evidence standpoint, is impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of

                              16

justice."). That principle guides our determination of this appeal.

B.

Plaintiff's claims are premised on N.J.S.A. 10:5-4.1, which construes other provisions of LAD to prohibit unlawful discrimination "against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." The Legislature intended this provision "to secure to handicapped individuals full and equal access to society, bounded only by the actual physical limits that they cannot surmount." Andersen v. Exxon Co., 89 N.J. 483, 495 (1982); Zive v. Stanley Roberts, Inc., 182 N.J. 436, 446 (2005) (quoting Andersen, supra, 89 N.J. at 495); see also Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 374 (1988) ("The import of the Law is that the handicapped should enjoy equal access to employment, subject only to limits that they cannot overcome.").

The treating physician testimony excluded at trial was offered to address a pivotal element of plaintiff's claims for disability discrimination. Under the statutory framework that governs LAD disability claims, the factfinder's first inquiry is whether the plaintiff has proven that he or she had a disease or

17

condition recognized as a disability under the LAD. N.J.S.A. 10:5-4.1; N.J.S.A. 10:5-5(q); see Victor v. State, 203 N.J. 383, 408-09 (2010) (identifying elements of prima facie case of disability claims based on failure to hire, wrongful discharge, retaliation, and hostile work environment); Viscik, supra, 173 N.J. at 15 (noting that "[t]he threshold inquiry in a handicapped discrimination discharge case is whether the plaintiff in question fits the statutory definition of 'handicapped'");[4] Clowes, supra, 109 N.J. at 597 (same); Andersen, supra, 89 N.J. at 499 (same).

For purposes of determining whether an employee meets that threshold burden, the LAD broadly defines "disability" as follows:

> "Disability" means physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological or developmental disability, including autism spectrum disorders, resulting from anatomical, psychological, physiological or neurological conditions which prevents the

---

[4] On January 1, 2004, the Legislature amended N.J.S.A. 10:5-5(q) to delete the term "handicapped" in favor of the term "disability." L. 2003, c. 180, § 5 (eff. Jan. 1, 2004) (amending N.J.S.A. 10:5-5(q)).

18

normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Disability shall also mean AIDS or HIV infection.

[N.J.S.A. 10:5-5(q).]

As this Court observed in Viscik, supra, the two categories of disability, "physical and non-physical," are distinct from one another and require different forms of proof. 173 N.J. at 15 (citing Rosemary Alito, New Jersey Employment Law, § 4-14:1, 170 (2d ed. 1999)); see also Clowes, supra, 109 N.J. at 594 ("[A]n alcoholic might suffer from either a 'physical disability [or] infirmity . . . which is caused by illness' or from a 'mental [or] psychological . . . disability' . . . or both.") (third ellipsis added) (quoting N.J.S.A. 10:5-5(q)). To demonstrate a physical disability, a plaintiff must prove that he or she is "(1) suffering from physical disability, infirmity, malformation or disfigurement (2) which is caused by bodily injury, birth defect or illness including epilepsy." Viscik, supra, 173 N.J. at 15 (citing N.J.S.A. 10:5-5(q)).[5]

---

[5] To meet the standard for a non-physical disability, "a plaintiff must prove that he or she is suffering (1) from any mental, psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." Viscik, supra, 173 N.J. at 16 (citing Alito, supra, New Jersey Employment Law, § 4-14:1 at 170; Clowes, supra, 109 N.J. at 594).

In Viscik and Clowes, this Court addressed the evidentiary burden imposed on a LAD plaintiff to prove a disability that is not readily apparent. Viscik, supra, 173 N.J. at 16-18; Clowes, supra, 109 N.J. at 597-99. The Court's opinion in Clowes, supra, arose from the plaintiff's allegation that he was unlawfully discharged from his employment due to his alcoholism. 109 N.J. at 584. The Court found that alcoholism is a "handicap" within the meaning of the LAD's provision as it then was drafted, based on evidence proffered by the plaintiff, which consisted primarily of the testimony of his expert, a recognized authority on alcoholism. Id. at 591-93, 595.

The Court concluded, however, that the plaintiff's proofs "fell short of demonstrating that he was an alcoholic." Id. at 595. It observed that "[t]he only evidence in the record regarding Clowes's alleged alcoholism is his own assertion that he was an alcoholic, and a partial medical record from his hospitalization" at a rehabilitation center. Id. at 598. The Court noted that neither the plaintiff's expert nor any other witness on his behalf had conducted a physical examination or reviewed the relevant medical records:

> Conspicuously absent from the record is any testimony from a treating or examining physician that Clowes had been diagnosed as an alcoholic. Given the complexity of the many diagnostic procedures involved, expert medical testimony is required to establish the fact of the employee's alcoholism.

20

[Id. at 597.]

Supported only by the generic testimony of the plaintiff's expert regarding alcoholism as a disease -- not by the testimony of an expert or treating physician familiar with his personal medical history -- the disability claim of the plaintiff in Clowes failed. Ibid.

In Viscik, supra, the disability alleged by the plaintiff was her morbid obesity, attributed to two factors, a "metabolic disorder that prevent[ed] [her] body from breaking down fats," and injuries from a car accident that triggered degenerative arthritis in her joints, restricted her lung capacity, and caused depression. 173 N.J. at 6. In support of her claim that her employer discharged her because of her disability, the plaintiff offered the testimony of her "treating physician since 1991," who "testified about Viscik's illnesses, including her obesity and its complications, as a medical expert qualified in internal medicine and weight-loss." Id. at 10. The Court concluded that "Viscik's testimony, medical history, and her expert's opinion fully support the finding that she established a physical handicap within the meaning of LAD." Id. at 17.

In that context, the Court held that "[w]here the existence of a handicap is not readily apparent, expert medical evidence is required." Id. at 16 (citing Clowes, supra, 109 N.J. at 591-

21

93; Rogers v. Campbell Foundry, Co., 185 N.J. Super. 109, 112 (App. Div. 1982)).  It noted that courts deciding LAD disability claims "place a high premium on the use and strength of objective medical testimony in proving the specific elements of each test contained in the statute."  Ibid. (citing Clowes, supra, 109 N.J. at 591-93; Enriquez v. W. Jersey Health Sys., 342 N.J. Super. 501, 521 (App. Div. 2001)); see also Victor, supra, 203 N.J. at 422-23 (adhering to mandate of Viscik that when disability is not readily apparent, "expert medical evidence is required"); Wojtkowiak v. New Jersey Motor Vehicle Comm'n, 439 N.J. Super. 1, 15 (App. Div. 2015) (same); Domurat v. Ciba Specialty Chems., 353 N.J. Super. 74, 90 (App. Div.) (same), certif. denied, 175 N.J. 77 (2002).

This Court has thus held that a LAD disability claim, in which the plaintiff's disability is not readily apparent, must be supported by "expert medical evidence," also characterized as "objective medical testimony."  Viscik, supra, 173 N.J. at 16; see also Clowes, supra, 109 N.J. at 597-98 (noting that diagnosis of alcoholism entails complex determinations that must be made by medical professionals).  By virtue of that requirement, a jury is guided by the testimony of witnesses qualified to assist it in understanding the disease or condition at issue in a given case.

C.

22

In that setting, we consider the trial court's conclusion that the testimony of a treating physician, not identified as an expert witness, is inadmissible to support a LAD plaintiff's contention that he or she has a disability that is not readily apparent.

Our courts have long permitted treating physicians to offer medical testimony regarding the diagnosis and treatment of their patients, pursuant to N.J.R.E. 701. That rule authorizes a court to admit the "testimony in the form of opinions or inferences" of a lay witness, if that testimony "(a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." N.J.R.E. 701.

This Court specifically addressed the testimonial role of a treating physician in Stigliano, supra, 140 N.J. at 310-17. There, the defendant physicians in a medical malpractice case sought to introduce the videotaped depositions of three physicians who had treated the infant plaintiff for seizures, which the plaintiffs claimed were caused by immunizations administered by the defendants. Id. at 307-08. The treating physicians testified that the child's seizures were not caused by the defendants' treatment, thus undermining the claims of their patient. Id. at 309. The trial court barred the defendants from presenting the treating physicians' testimony,

23

and the Appellate Division reversed that determination. Id. at 309-10. This Court granted the plaintiffs' motion for leave to appeal. Id. at 307.

Noting that "the characterization of the treating doctors' testimony as 'fact' or 'opinion' creates an artificial distinction[,]" the Court identified the "critical point" regarding treating physician testimony: "the treating doctors to treat their patients must determine the cause of a disease, whether that determination is characterized as fact or opinion." Id. at 314. The Court held that

> as fact witnesses, the treating doctors may testify about their diagnosis and treatment of [the infant's] disorder, including their determination of that disorder's cause. Their testimony about the likely and unlikely causes of [the infant's] seizure disorder is factual information, albeit in the form of opinion. See N.J.R.E. 701 (permitting fact witness to testify in the form of opinion to assist in determining fact in issue). Because the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury. That holding should not deter patients from freely disclosing information necessary for proper treatment and diagnosis. Only after patients put their injury or disease in issue may a treating doctor testify about the diagnosis and treatment of that injury or disease.
>
> [Ibid.]

The Court thus acknowledged that a treating physician may be permitted to testify as to the diagnosis and treatment of his

24

or her patient, pursuant to N.J.R.E. 701.[6]  Ibid.; see also Ginsberg, supra, 292 N.J. Super. at 32 (holding that "[i]t is well settled that treating physicians may testify as to any subject relevant to the evaluation and treatment of their patients"); Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, comment 4 to N.J.R.E. 701 (Gann 2015) (noting that "[w]hen treating physicians are called to testify about their observations, diagnosis and treatment of an injured or ailing plaintiff, they are not testifying as expert witnesses, even though they may possess the requisite qualifications[,]" but are offering factual evidence and opinion evidence governed by N.J.R.E. 701).

Our court rules provide for pretrial disclosure of the proposed testimony of treating physicians, so that the testimony may be explored by the opposing party in discovery.  An adversary may request, by interrogatory, "the name of an expert

---

[6]  Although the defendant physicians, not the plaintiff, called the infant plaintiff's treating physicians in Stigliano, supra, that factor did not bar the testimony.  140 N.J. at 312-13.  The Court distinguished Graham v. Gielchinsky, 126 N.J. 361 (1991), in which it had held that absent exceptional circumstances, parties may not present the opinion testimony of experts whom their adversaries have consulted, observing that the plaintiffs had consulted the treating physicians for purposes of treatment, not litigation.  Ibid.  The Court accordingly reasoned that the defendants' use of the infant plaintiff's physicians' testimony would not affect the child's medical treatment or the plaintiffs' counsel's search for experts.  Id. at 313.

or treating physician of the answering party or a copy of the expert's or treating physician's report[.]"  R. 4:17-4(a). Pursuant to Rule 4:17-4(e), the responsive party shall

> annex to the interrogatory an exact copy of the entire report or reports rendered by the expert or physician.  The report shall contain a complete statement of that person's opinions and the basis therefor; the facts and data considered in forming the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; and whether compensation has been or is to be paid for the report and testimony and, if so, the terms of the compensation.
>
> [R. 4:17-4(e).]

Rule 4:10-2(d), which sets forth the method by which "[d]iscovery of facts known and opinions held by experts" may be obtained, similarly provides for notice and discovery of the proposed testimony of treating physicians.  The rule authorizes discovery by interrogatory of "the names and addresses of each person whom the other party expects to call at trial as an expert witness, including a treating physician who is expected to testify[.]"  R. 4:10-2(d)(1).  The opposing party may elect to explore the treating physician's opinions in a deposition pursuant to Rule 4:10-2(d)(2), as well as through supplemental written discovery.  Thus, under the court rules, a party seeking to present treating physician testimony at trial must disclose

26

the substance of the witness's anticipated testimony, and the basis for that testimony, if requested to do so in discovery.

The testimony of a treating physician is subject to an important limitation. Unless the treating physician is retained and designated as an expert witness, his or her testimony is limited to issues relevant to the diagnosis and treatment of the individual patient. See, e.g., Stigliano, supra, 140 N.J. at 314-16 (authorizing treating physicians to testify as to care and diagnosis of patient); Hutchinson v. Atlantic City Med. Center-Mainland, 314 N.J. Super. 468, 479 (App. Div. 1998) (same); Serrano v. Levitsky, 215 N.J. Super. 454, 457-59 (Law Div. 1986) (barring treating physician from testifying about defendant doctors' alleged malpractice because that subject was beyond scope of patient care); Piller v. Kovarsky, 194 N.J. Super. 392, 399-400 (Law Div. 1984) (same). Given that distinction, if a particular claim requires medical testimony extending beyond the plaintiff's own diagnosis and treatment, the plaintiff may require the testimony of an expert, conforming to N.J.R.E. 702 and 703.

Contrary to defendants' contention, nothing in this Court's opinions in Clowes and Viscik prohibit the admission of treating physician testimony to support a LAD disability claim. In both cases, the Court recognized that the question of disability is a medical determination and that a jury should be assisted by the

27

testimony of qualified witnesses in that determination. Viscik, supra, 173 N.J. at 16; Clowes, supra, 109 N.J. at 591-93. The Court did not exclude the testimony of treating physicians; indeed, in Clowes, it identified the fact that plaintiff's expert witness had neither examined him or reviewed his medical records, and the absence of testimony by a treating or examining physician, as deficiencies in the plaintiff's proofs. Clowes, supra, 109 N.J. at 597. If the question of a plaintiff's disability can be effectively addressed by testimony limited to the plaintiff's diagnosis and treatment, a treating physician may provide the "expert medical evidence" and "objective medical testimony" envisioned by the Court in Viscik.

In sum, in an appropriate setting, the testimony of a treating physician may be admitted to support a plaintiff's LAD disability claim, provided that the proponent of the testimony provides notice and responds to discovery requests in accordance with the court rules, and the testimony satisfies N.J.R.E. 701 and other applicable Rules of Evidence. Stigliano, supra, 140 N.J. at 314; Ginsberg, supra, 292 N.J. Super. at 32-33.

D.

In accordance with that principle, the trial court should have permitted Dr. Ciambotti to testify about plaintiff's IBS. Plaintiff provided the information about Dr. Ciambotti's proposed opinion that was requested in defendants'

28

interrogatories:  the identification of Dr. Ciambotti as a person with knowledge relevant to plaintiff's claims and as one of plaintiff's treating physicians, and a summary of his proposed testimony.  She complied with the discovery requests posed to her, as they related to Dr. Ciambotti.

Moreover, as described by plaintiff's counsel to the trial court and reflected in the physician's correspondence with the Township, the proposed testimony of Dr. Ciambotti would have been limited to his diagnosis and treatment of plaintiff.  The treating gastroenterologist would have addressed plaintiff's symptoms, the basis for plaintiff's IBS diagnosis, the impact of IBS on plaintiff's everyday life, and the steps that Dr. Ciambotti recommended to alleviate plaintiff's symptoms. Nothing in the record suggests that plaintiff intended to ask Dr. Ciambotti to opine on global questions beyond the scope of his role as plaintiff's treating physician.  The trial court erred when it barred Dr. Ciambotti from testifying about plaintiff's diagnosis and treatment.

In the broader setting of plaintiff's trial, the trial court's constraint on Dr. Ciambotti's testimony was not harmless error.  As confirmed by its proposed questions regarding IBS medications and the impact of a patient's diet on the condition, the jury sought information about plaintiff's IBS diagnosis, but was denied that information.  Thus, plaintiff was not afforded a

29

fair opportunity to prove that she suffered from a disability within the meaning of the LAD. N.J.S.A. 10:5-5(q); see also Tynan v. Vicinage 13 of Superior Ct. of New Jersey, 351 N.J. Super. 385, 399 (App. Div. 2002) (holding that LAD disability claim based in part on IBS alleged by plaintiff gave rise to jury question sufficient to withstand summary judgment). Moreover, because plaintiff failed to meet her threshold burden of proving a disability, the jury never considered the other elements of her hostile work environment, failure to accommodate, wrongful demotion or transfer, and wrongful termination claims. The limitations on Dr. Ciambotti's testimony may also have affected the jury's determination of plaintiff's retaliation claim, which was premised in part on her claim of disability. The trial court's error with respect to Dr. Ciambotti's testimony was not harmless.

The trial court also erred when it restricted the testimony of plaintiff's treating psychiatrist, Dr. Rochford, whose testimony would have supported her claim for non-economic damages. Dr. Rochford was properly designated by plaintiff as one of her treating physicians, and plaintiff gave defendants a description of the psychiatrist's expected testimony, as requested in defendants' interrogatories. The opinions that plaintiff sought to elicit from Dr. Rochford were properly confined to plaintiff's symptoms, diagnosis and care.

30

Plaintiff's treating psychiatrist should have been permitted to testify about those topics, subject to the limitations of N.J.R.E. 701 and other applicable Rules of Evidence.  Because we affirm the Appellate Division's determination that the trial court should have granted plaintiff's motion for a new trial, based on the restrictions imposed on the testimony of Dr. Ciambotti, we need not determine whether the trial court's limitations on the testimony of Dr. Rochford constituted reversible error.

Based on the limitations imposed on Dr. Ciambotti's testimony, we concur with the Appellate Division that the trial court should have found a "miscarriage of justice under the law" under Rule 4:49-1(a).  See R. 2:10-1; Viscik, supra, 173 N.J. at 20 (ordering new trial where trial court instruction "essentially focused the jury's attention on a claim not at issue in the case and mixed two theories, pretext and reasonable accommodation, that are completely and purposefully distinct from one another").[7]  Plaintiff is entitled to a new trial.

---

[7]  The trial court's denial of plaintiff's motion for a JNOV was not addressed by the Appellate Division panel.  On appellate review of a trial court's denial of a motion for JNOV, "we 'must accept as true all evidence supporting the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced [from the evidence].'"  Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 572 (2010) (alteration in original) (quoting Lewis v. Am. Cyanamid Co., 155

V.

We add the following comment regarding pretrial discovery of treating physician testimony in civil litigation. Rules 4:17-4(a), (e) and 4:10-2(d)(1) compel the service of reports by treating physicians who will testify at trial, in the event that those reports are requested in discovery.[8] A treating physician's report serves an important function; it provides the adversary with notice of the facts and opinions to which the physician will testify, and permits that party to assess the need for additional discovery and for medical testimony at trial. We recognize, however, that the preparation of a detailed written report may impose a significant burden on a treating physician who has not sought to be involved in the litigation, and has not been retained as an expert witness.

We request that the Civil Practice Committee consider whether Rules 4:17-4(a), (e) and 4:10-2(d)(1) should be amended to clarify the form and content of a report that must be served, if requested, in advance of a treating physician's testimony. We suggest that the Committee evaluate, among other options, an

---

N.J. 544, 567 (1998)). That standard is not satisfied in this case; plaintiff's motion for JNOV was properly denied.

[8] We do not agree with plaintiff's contention that Rules 4:17-4(a), (e) and 4:10-2(d)(1) require service of a treating physician's report only if the treating physician happens to have prepared one.

32

amendment permitting the service of a summary of the treating physician's opinions and the basis for those opinions, as an alternative to a written report prepared by the physician. See, e.g., R. 3:13-3(b)(1)(I), -3(b)(2)(E) (authorizing, in criminal case in which expert is expected to testify, service of "a statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion").

## VI.

The judgment of the Appellate Division is affirmed, and the matter is remanded to the trial court for a new trial.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion. JUSTICE FERNANDEZ-VINA did not participate.

SUPREME COURT OF NEW JERSEY

NO.    A-25    SEPTEMBER TERM 2014

ON CERTIFICATION TO      Appellate Division, Superior Court

PATRICIA DELVECCHIO,

        Plaintiff-Respondent,

                v.

TOWNSHIP OF BRIDGEWATER, TOWNSHIP OF
BRIDGEWATER POLICE DEPARTMENT, CHIEF
RICHARD BORDEN, and WILLIAM CONNIFF,

        Defendants-Appellants,

            and

EDWIN J. SKIDMORE and CATHY HAMILTON,

        Defendants.

DECIDED            April 28, 2016
                Chief Justice Rabner            PRESIDING
OPINION BY         Justice Patterson
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY

| CHECKLIST | AFFIRM AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | ------------------ | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |